No. 2--08--0105    Filed: 12-31-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| OUR SAVIOR EVANGELICAL LUTHERAN CHURCH, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 06--MR--99 |
| MICHAEL B. SAVILLE, Mayor pro tem, THE CITY COUNCIL OF THE CITY OF AURORA, THE CITY OF AURORA, MARGARET TRUAX, Chairman of the Aurora Zoning Board of Appeals, and THE AURORA ZONING BOARD OF APPEALS, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Paul McCue, Yvette McCue, and Ray Anderson, as Trustee of the Anderson Family Trust, Defendants). | ) ) ) | Honorable Michael J. Colwell, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

The plaintiff, Our Savior Evangelical Lutheran Church (Our Savior or the church), applied for (1) a site plan review of its proposed new building addition, parking lot, and driveway, or, in the alternative, (2) a special use permit for the same improvements to the church's property. After the defendants, Michael B. Saville, Mayor pro tem; the City Council of the City of Aurora; the City of Aurora; Margaret Truax, Chairman of the Aurora Zoning Board of Appeals; and the Aurora Zoning Board of Appeals (collectively, the city), denied the applications, the church filed suit, claiming that

the denials of its applications were contrary to the manifest weight of the evidence and denied the church due process. The trial court entered judgment for the city, and the church appealed. We affirm in part, reverse in part, and remand.

FACTUAL BACKGROUND

Our Savior is located on a lot stretching between Downer Place and Garfield Avenue in Aurora. Currently, the front entrance to the church and the sanctuary is at 420 Downer Place. A parking lot containing 46 spaces is located behind the church, with access from Garfield Avenue. Between the entrance in the front and the parking lot in back, there is a downhill slope toward the back of the church building, so that the parking lot is approximately 17 to 19 feet lower than the front entrance to the church. When entering from the parking lot through the back of the building, one must climb two and a half flights of stairs to get to the sanctuary level. Our Savior currently has no elevator.

The church owns about three acres of land, zoned B-1 and R-5. Just west of the church, and connected to the church by a walkway, is a stone and frame building used for church offices. About 20 feet west of this building is the property line for the lot on which the Copley Mansion is located. The Copley Mansion, a building in the classical revival style, is on the National Register of Historic Places. Used for many years as an office (and zoned B-1 and then O), it was bought in March 2004 by the McCue family, and the City of Aurora rezoned the property as R-1 in November 2004. It currently serves as the private residence of the McCue family. The Copley Mansion fronts on Downer Place. The lot on which it sits extends about 162 feet along Downer Place and stretches 206 feet south to the back lot line, which is about halfway through the block. Running alongside the west boundary of the Copley Mansion property is a 40-foot-wide strip of land that is owned by Our

Savior. Our Savior also owns all of the land behind the Copley Mansion (from the back lot line of the Copley Mansion to Garfield Avenue). Thus, the Copley Mansion is surrounded by property owned by Our Savior. Other property in the area ranges from single-family and multifamily residences that have been recognized as historically significant, to several more recent multifamily apartment and condominium buildings. Most of the surrounding lots are zoned R-5 (multifamily residential).

In July 2004, Our Savior submitted its first application for a special use permit to construct a two-story addition to the church south of the sanctuary, which would include classrooms and an elevator; a covered drop-off entrance on the southwest corner of the addition on the same level as the sanctuary; a parking lot located on the church property behind the Copley Mansion; and a driveway leading from Downer Place to the covered drop-off and new parking lot. To alleviate a neighbor's concerns that cars coming out of the driveway would shine their headlights into his apartment across the street, and to allow for a wider buffer between the driveway and the Copley Mansion, the church first proposed to have the driveway entrance on Downer Place located approximately 60 feet away from the western boundary of the Copley Mansion lot. To accomplish this, the church proposed to swap the 40-foot-wide strip immediately adjacent to the Copley lot for the 80-foot-wide parcel immediately west of that strip, which was owned by the City of Aurora. The initial reaction to this proposal was favorable, with the proposal enjoying the support of the then-alderman, although there was some opposition voiced by neighbors and preservationists. Following a public hearing on the application on February 16, 2005, the plan commission made findings of fact that the special use would be in the public interest and recommended that the application be granted.

However, in April 2005 a new alderman was elected, and the land swap aspect of the proposal did not come to fruition. Thereafter, the church withdrew the application proposing the land swap.

On August 26, 2005, the church filed two new applications, each of which sought approval for the same building addition, driveway, covered drop-off entrance, and new parking lot. The primary changes from the previous application were that the driveway would run over only church-owned property (the 40-foot-wide strip along the west side of the Copley Mansion lot), there would be more extensive landscaping to shield the driveway from the mansion, and the driveway and parking lot would use porous pavers, obviating the need to create any water retention ponds. One application sought approval through the site plan review process, pursuant to section 5.14--2(h)(1) of the Aurora Zoning Ordinance (AZO or ordinance) (Aurora Zoning Ordinance §5.14--2(h)(1) (2005)). The other application, filed as an alternative in the event that the church was not permitted to use the site plan review process, sought a special use permit to construct the proposed additions. A brief description of these procedures follows.

Under the ordinance, a church is permitted as a special use in all zoning districts (Aurora Zoning Ordinance §5.14--2(a) (2005)) and is one of several enumerated special uses permitted in districts zoned R-5 or B-1 (Aurora Zoning Ordinance §§11.6--7.1, 12.2--1.10A (2005)). A special use permit application seeking, for example, additions to a church must be reviewed first by the planning commission, which must make findings and decide whether to recommend that the special use permit be granted. Aurora Zoning Ordinance §14.6--5 (2005). The planning commission may not recommend that a special use permit be granted unless it finds that: (1) the use will not be unreasonably detrimental to nor endanger public health, safety, morals, comfort, or general welfare; (2) the use will not injure the use and enjoyment of other property in the immediate vicinity or

substantially diminish neighborhood property values; (3) the use will not impede the orderly development of permitted uses on the surrounding property; (4) adequate utilities, access roads, drainage, and other necessary facilities will be provided; (5) adequate measures will be taken to provide ingress and egress in a manner designed to minimize traffic congestion; and (6) the use otherwise conforms to the regulations of the district in which it will be located. Aurora Zoning Ordinance §14.6--6 (2005). The planning commission's report and recommendation to the city council may include "additional conditions *** when they are deemed necessary for the protection of the public interest." Aurora Zoning Ordinance §14.6--5 (2005). Thereafter, "the city council may grant or deny any application for a special use" (Aurora Zoning Ordinance §14.6--5 (2005)) and may also impose any "conditions and restrictions upon the establishment, locations, construction, maintenance and operation of the special use as deemed necessary for the protection of the public interest" (Aurora Zoning Ordinance §14.6--8 (2005)). Although such a decision is usually carried by a simple majority of the city council members, if the owners of 20% of the frontage adjacent to the proposed use have filed written protests, the special use permit may be granted only if it is approved by a supermajority of two-thirds of the city council. Aurora Zoning Ordinance §14.6--5 (2005).

The second procedure, site plan review, is a special process set out in section 5.14 of the AZO, the portion of the AZO that regulates churches. Aurora Zoning Ordinance §5.14--1 et seq. (2005). Under section 5.14--2, all buildings built or used as churches after July 28, 1986 (the effective date of this portion of the AZO), must meet certain requirements relating to setbacks, green space, lighting, location and parking. Aurora Zoning Ordinance §§5.14--2(b) through (f) (2005). The subsection on location provides that "[c]hurches shall abut an arterial or major collector street,

as shown on the City of Aurora comprehensive map." Aurora Zoning Ordinance §5.14--2(e) (2005). The subsection on parking provides that a church must provide off-street parking that meets the requirements listed elsewhere in the ordinance,[1] but that the zoning administrator may authorize the following variations from the parking requirements: the phased paving of parking lots; the reduction of parking requirements due to shared abutting parking; and the transfer of some or all of the required parking off site, if an off-site lot is within a reasonable distance of the church and adequate pedestrian walkways are provided. Aurora Zoning Ordinance §5.14--2(f) (2005).

Section (h) allows a church to use the site plan review process, in which the church submits plans and other documents to the zoning administrator, who then presents it to the planning commission for "public review." Aurora Zoning Ordinance §§5.14--2(h)(1) through (h)(2) (2005). The planning commission then reviews the site plan "for the sole purpose of determining that said plan is in compliance with the applicable zoning and plan standards," and the commission then forwards it to the planning and development committee of the city council, which conducts the same review. If the site plan complies with the applicable standards, the zoning administrator must issue a building permit. Aurora Zoning Ordinance §5.14--2(h)(4) (2005). Thus, under the site plan review process, the grounds for denial of a building permit are limited to noncompliance with the applicable zoning standards, and the application need not go before the entire city council. Under section 5.14--3, if a church "wishes to vary the standards of subsection 5.14--2" (in other words, if the

---

[1]The record on appeal suggests, through the statements of various city staff and zoning officials, that in 2005 and 2006 this requirement was one parking space for every six seats in the sanctuary. In the AZO as recodified sometime after May 30, 2006, one parking space is required for every four seats in the sanctuary.

church cannot comply with the above-mentioned setback, green space, lighting, location, and parking standards), it may seek a special use permit using the ordinary procedures for such an application. Aurora Zoning Ordinance §5.14--3 (2005). Variances from the standards applicable to churches may be granted upon a finding that the church's proposal will not "be a detriment to the surrounding property," will not significantly increase noise in a residential area, will not significantly increase traffic congestion in the area, and will be consistent with the city comprehensive plan. Aurora Zoning Ordinance §5.14--3(a) (2005). The city council may also add to or increase the applicable standards in order to prevent nuisances, protect abutting property, and protect the neighborhood character. Aurora Zoning Ordinance §5.14--3(b) (2005).

On November 15, 2005, one day before the planning commission hearing on the church's applications, the zoning administrator faxed the attorney for Our Savior a copy of the city staff's report on the church's applications. In it, the staff concluded that the site plan review procedures were not available to the church, on two grounds. First, the church did not meet the standard for location contained in section 5.14--2(e), in that it was not located on an arterial or major collector street (Downer Place and Garfield Avenue are both minor collector streets). Second, in 1993, the city council had granted a special use permit for a developer to construct townhouses and parking on three lots, including a lot currently owned by Our Savior that was part of the proposed parking lot. The city staff believed that a new special use permit would be necessary to supersede the 1993 special use permit, even though 12 years had elapsed and that earlier special use could not now be accomplished because the three lots were currently owned by three different owners. The staff recommended that Our Savior's proposal be considered solely as a special use permit application.

Further, regarding the church's application for a special use permit, the staff recommended that the application be approved but with the following modification: "Per Section 5.14(f)(2) [of the AZO], the need for additional off-street parking for the new addition is waived and the new parking lot and driveway are to be removed from the plans." Thus, under the staff recommendation, the church would receive a special use permit to build the addition but not the driveway, parking lot, or covered drop-off. The staff report justified this recommendation by noting that "the main opposition from the community has been the proposed driveway and parking lot and their impact on the Copley Mansion and its historic grounds, and the view from Downer Place," and commenting that "staff was not supportive" of having the driveway located so close to the mansion. In addition, the staff report referred to "an informal study," conducted by the city since Our Savior's earlier special use permit application, of on- and off-street parking available in the vicinity. The report stated that during the church service at 9 a.m. on Sunday morning (the busiest service), an average of 30 to 35 cars were parked in the current lot (which had a capacity of approximately 46 spaces), and between 24 and 32 cars were parked on Downer Place and at the intersection of Downer and Chestnut. However, on two occasions in the last few months the number of cars parked in the lot had exceeded 50. The report noted that people attending services at Our Savior currently parked as far away as the intersection of Downer and View, over 500 feet from the church's front entrance. Considering a "reasonable walking distance" of less than 500 feet, however, the report estimated that "up to 75-100 parking spaces [might] be available on the street on Sunday morning." Concluding that on-street parking was sufficient to meet the parking needs of the congregation, the report recommended removing the parking lot and driveway from the church's proposed special use.

On November 16, 2005, the planning commission held a public hearing on the church's application for a special use permit. The zoning administrator spoke first, presenting the background of the application and the city staff's position as outlined in the staff report. Thereafter, all of the presenters and witnesses were sworn in. The attorney for the church made a presentation on the need for expansion, due to a growth rate in the congregation of approximately 8% during each of the last two years and to the fact that the church presently had only 650 square feet of classroom space. He also spoke regarding the need for a covered drop-off point at the sanctuary level and for an elevator, as there were 40 steps to climb from the existing parking lot to the sanctuary and 180 steps to walk from the curb in front of the church to the nearest pew, and 20% of the congregation was over 65 years old. The civil engineer for the project described the current application's proposed stormwater management and use of porous pavers, and he answered questions on this subject from the planning commission members. The church then called Gary Popp, a professional property appraiser with 20 years of experience. Mr. Popp stated that in his opinion the proposed parking lot would not decrease neighboring property values, which would continue to increase as they had in the past. The church's last witness was the pastor for Our Savior, who spoke regarding the commitment of the church to remain in its current urban location and to continue to be a good neighbor to the surrounding area.

The meeting was then opened for public comment. Shirley Flaherty, a preservationist, stated that she had serious concerns about the project because of its proximity to the Copley Mansion. Al Signorelli stated that he represented the Aurora Heritage League, which opposed the project for the same reason. Jason Palmer, an employee of Our Savior and the music director for the Fox Valley Youth Symphony, which rehearses and performs at the church, spoke regarding the need for additional parking for special events such as concerts. Mr. Palmer reported confrontations on the

street with residents who were angry because he or others had taken the residents' usual parking places on the street. Pat Theurer, a neighbor, stated that she and her husband were members of the Second Ward committee, which wished to see a park on the property, rather than a parking lot. She also opined, as a realtor, that the proposal would "affect" her property's value. (She did not explicitly state how the value would be affected.) Julie Frankino, one of the superintendents of the Sunday school at Our Savior, spoke regarding the need for additional classroom space and a drop-off located away from street traffic. Francis Youssi, a member of Our Savior's congregation for 50 years, stated that the proposed parking lot and drop-off were essential to the continued functioning of the church and that the church had explored other options but they did not work out. Sara Michels, a church member, spoke about the importance of the church in her family's lives and in the community, and she stated that she believed that the church should be allowed to use its own land to grow as it needed to do. Gary Hurt, an attorney who represented the McCues on the extinguishment of the easement running along a brick driveway between the church and the McCues' lot, denied the claim of the church's attorney that the land swap between the church and the city had been part of the deal for the easement extinguishment. Ray Anderson, who lived across Downer Place from the proposed driveway entrance, spoke in opposition to the proposal, stating that he was concerned about the location of the driveway and believed it would decrease the value and the enjoyment of his property. He also believed that the parking lot and driveway would detract from the area around the Copley Mansion, although the church had been a good neighbor for many years and it should be permitted to build the addition and drop-off without the parking lot and driveway. Dr. Edward Garrity expressed fears that the church would leave its present location if the special use permit were denied and said he would rather have a parking lot than an empty swimming pool

(apparently a reference to another abandoned urban location). John St. Clair, a neighbor, stated that he had been served with a request to "downzone" his home in order to reduce the number of cars on the street and that the church's proposal was "a perfect example of keeping cars off the street." He did not want a public park on that property instead. Jeff Nash, a church member, spoke to say that the church needed all of the planned expansion, including the drop-off and parking, as his mother and father-in-law currently could not walk the distance to get into the church. Peter and Mary Beth Groom, a husband and wife, spoke separately to say that they lived in the immediate area and believed that the church adds to rather than subtracts from the historical atmosphere of the area, and that many of their neighbors (the majority, they believed) supported the church's proposal. Peter Groom also stated that the McCues had previously owned a home that was older than the Copley Mansion and that they had not preserved in a historically appropriate manner; that the church had made efforts to address neighbors' concerns; that a new off-street parking lot would improve traffic congestion in the area; and that it would be "a disgrace" if Our Savior were forced to leave the neighborhood because it could not meet its expansion needs. Bret Fogelberg, a church member, spoke of the church's need for the expansion, including the parking lot, and stated that using the YMCA parking lot on the other side of Garfield Avenue made him uncomfortable because it was in a more run-down area. Heather Ortlieb and her daughter Sabrina, church members who also teach in the preschool Sunday school, spoke regarding child safety concerns posed by the current parking layout and also about the difficulty of getting their wheelchair-bound godmother into the church and her inability to participate in events after the service. Jack Ficken, a pastor at another Lutheran church in the Aurora area, praised Our Savior's commitment to its neighborhood. An attorney for the McCues spoke in opposition to the proposal, stating that the Copley Mansion's nearness to 10

light standards, the driveway, and the drop-off would significantly impact and impede the enjoyment of the property and its potential value. She argued that the church's application therefore did not meet the requirements for a special use permit. The McCues believed that the city staff's recommendation to eliminate the parking lot, drop-off, and driveway was "absolutely appropriate."

Following a recess, the attorney for Our Savior called the zoning administrator to testify regarding the procedures followed in distributing copies of the staff report. The zoning administrator also testified, in response to questioning, that the city traffic engineer was not involved in gathering the traffic and parking data contained in the staff report, nor did the staff use the mechanical devices the traffic engineer employs. The city staff believed that the church's proposal would have no substantial impact on traffic or noise in the area. The zoning administrator testified that he met with the McCues before they purchased the Copley Mansion and told them that Our Savior was seeking to put parking on the lots behind the mansion. At the time the church bought the lots behind the mansion, the mansion was still being used as an office. Finally, he testified that in 1993 when the city granted the special use permit to construct the townhouses, they would have been located within eight feet of the Copley Mansion property line.

A city attorney then questioned the zoning administrator, establishing that the proposal involving a land swap between the church and the city never went before the city council and thus never became a binding agreement. Regarding the changes in the city staff recommendations between the earlier proposal and the current one, the staff preferred to have the driveway located farther from the mansion property so that the mansion was not "hemmed in." The city staff's position on this had remained consistent over the last two years. In addition, because parking had been an

issue during the consideration of the earlier proposal, during the period between the two proposals the city staff undertook its informal study of parking, observed that the current parking lot on Garfield was not being fully used during services, and concluded that "it wasn't absolutely necessary to add more parking."  The change in the mansion's zoning, from office to residential, was also a factor.

The planning commission members then questioned the presenters.  The church's attorney stated that the church was willing to work with the McCues on the landscaping and lighting along the driveway.  The zoning administrator stated that the AZO required one parking space for every six seats in the sanctuary.  There were about 350 seats in the current sanctuary, and after the addition there would be about 405, meaning that the ordinance would require 67 parking spaces.  Asked about whether there was an alternative to the proposed driveway location, the zoning administrator said that it would be difficult:

"It is so unique with the grade and it's been looked at thoroughly, thoroughly, thoroughly. It's really, really tough to do anything else.  You could potentially widen the existing brick drive going to Garfield, but you'd have to blow that all open.  The slope would way exceed what the City, the typical standards were.  It wouldn't be real safe with ice and snow.  It's not a real good situation."

After other questions regarding the current zoning of the lots, the zoning administrator presented the staff recommendation to grant the application without the parking lot, driveway, or drop-off.

The members of the planning commission debated and commented on the proposal, and then voted unanimously to approve the special use permit as proposed by the church, including the

parking lot, driveway, and covered drop-off. The planning commission then made the following findings of fact:

(1) the establishment of the proposed special use would not be unreasonably detrimental to or endanger the public health, safety, morals, comfort, or general welfare, because it was a church use, which "definitely" supported the safety, morals, comfort, and general welfare of the area and was not unreasonably detrimental to the neighborhood;

(2) regarding whether the proposed special use would be injurious to the use and enjoyment of nearby property, the only properties that would be negatively affected would be the homes across the street from the driveway, which might have headlights shining into them, and the enjoyment of property in the area would be increased by the decrease in cars parking on the street, but there would be a negative effect on the Copley Mansion and, if the plan went forward, then the planning commission "would look strongly at an opportunity to improve this plan to be more sensitive to the Copley Mansion";

(3) property values in the area would not be impaired by the proposed special use, and the Copley Mansion would be affected adversely only if the project were not done properly;

(4) because the area was already highly developed and the church property was well maintained in appearance, the proposed special use would not impede the normal and orderly development of surrounding properties;

(5) adequate utilities, access roads, drainage, and other facilities were included in the plan;

(6) with respect to traffic and congestion caused by ingress and egress, with the parking lot there would be fewer vehicles on the street and there would be a much improved

environment and better access to the church; and

(7) the proposed special use conformed in all other respects to the applicable

regulations of the zoning district in which it was located.

The planning commission then forwarded its findings of fact and recommendation to the planning

and development committee of the city council.

On December 15, 2005, the planning and development committee considered the application

for a special use permit. In addition to the three city council members who were on the committee,

the zoning administrator, the church's attorney, and an attorney for the city were present. The

church's attorney addressed some of the concerns that had been raised during the planning

commission hearing. He argued that the reason the existing church parking lot was not filled during

Sunday services was that it was so difficult for congregation members to climb the 40 steps from that

lot up to the sanctuary, and thus older persons and families with small children did not use the lot

and instead parked on the street. He also noted that in the church's earlier proposal, the driveway

was located farther from the mansion's lot line, and he stated that the proposal failed because the city

did not want to proceed with the land swap. The church had attempted to accommodate the concerns

of neighbors by moving the driveway as far from the mansion lot line as was possible within the 40-

foot strip, using light fixtures along the driveway that would be attractive and would limit the amount

of light spilling into the yard of the Copley Mansion, and using porous pavers instead of building

retention ponds. He noted that fire-lane requirements necessitated that the driveway be a certain

width and that there be a certain amount of maneuverability at the inner end of the driveway. The

zoning administrator responded to questions that had been raised about the informal parking study,

saying that it had been performed using the same methodology that the city always uses for parking

studies, which is a count performed by staff. At the close of the meeting, the committee voted to deny the special use application by a vote of two to one. However, under the AZO's special use procedures, the application was forwarded to the full city council, regardless of the outcomes at the planning commission and the planning and development committee.

At the same time that the church's special use application was proceeding, the church appealed the zoning administrator's decision that the church could not use the site plan review process. That appeal was heard on January 18, 2006, by the zoning board of appeals (ZBA). The zoning administrator stated that Our Savior could not use the site plan review process because the church did not comply with the location standards set out in section 5.14 of the ordinance, namely, the streets on which it was located, Downer Place and Garfield, were minor collector streets rather than arterial or major collector streets as required. Aurora Zoning Ordinance §5.14(e) (2005). He also outlined some of the history of section 5.14(h) (the site plan review procedure) prior to its enactment in 1986. The church's attorney argued that requiring location on an arterial or major collector street was an unconstitutional burden on churches that was imposed on no other type of land use. The attorney for the city argued that the requirements of section 5.14(e) (Aurora Zoning Ordinance §5.14(e) (2005)) were not unconstitutional because the section as a whole conferred on churches a special benefit (the ability to use the less onerous site plan review procedure), not a burden. The ZBA stated that its role under the Aurora Zoning Ordinance was limited to determining whether a variance should be granted if one were requested, and it was unable to decide questions of constitutionality. The ZBA then voted four to two in favor of affirming the zoning administrator's decision that the church could not proceed via site plan review and must instead follow the special

use application procedures, on the ground that the church did not meet the location requirements of section 5.14(e) (Aurora Zoning Ordinance §5.14(e) (2005)).

On January 24, 2006, the city council met to consider Our Savior's application for a special use permit. However, the application was first discussed in a transcribed meeting of the committee of the whole, in which the council members conversed among themselves and questioned city staff. The council members discussed whether the protests filed by owners of adjacent frontage necessitated a two-thirds supermajority and concluded that they did, so that at least nine votes in favor were required to carry. The committee received a brief report regarding the outcome of the previous week's ZBA hearing. The members then discussed whether they could (and whether they wished to) place conditions on the special use permit, as the city staff had recommended, i.e., the waiver of the applicable parking requirement (Aurora Zoning Ordinance §5.14(f) (2005)), the removal of the parking lot and driveway from the plan, and permission to build the drop-off entry to the building addition in the existing parking lot if the church wished. They concluded that they could place such conditions on the special use, but they decided to hold off on the decision about whether to do so until the regular council meeting, at which the church could comment on the imposition of the conditions.

The city council then proceeded with its regular meeting agenda, on which the church's special use application appeared under "unfinished business." The mayor noted the large turnout. The attorney for Our Savior spoke to say that the church's proposal had been amended without notice, and he then spoke passionately about the "morals" of the process by which Our Savior had come to submit the present application for a special use and the benefit to the community from the church's presence. He also stated that a distance of 22 feet between a residential property and a

parking lot or driveway was not uncommon in urban areas. All five of the persons who had signed up to speak (for a limit of three minutes each) were opposed to the proposal. Al Signorelli and Shirley Flaherty both spoke as preservationists, urging the city to support the hard work of historical rehabilitation and reject the parking lot and driveway. The attorney for the McCues spoke, arguing generally that neighbors had the right to object and that the church did not have to put the drop-off and driveway so close to the Copley Mansion. Paul McCue, one of the owners of the Copley Mansion, stated that the proposal would have a significant negative impact on surrounding property values and complained specifically about the amount of lighting and the grade change near the carriage house that the proposed parking lot would require. Carol McCue, Paul's mother, deplored the vilification of the McCues, which was contrary to the morals the church's attorney had spoken of. Mr. Anderson, who had not signed up to speak but was granted permission to do so, objected to the traffic and headlights from cars leaving the proposed driveway across from his home.

City council members then introduced a motion to amend the proposed special use to add that: (1) the need for additional off-street parking for the new addition would be waived and therefore the new parking lot and driveway would be removed from the proposal, and (2) the building addition would be approved without the proposed covered drop-off, but with advance permission to construct a similar covered drop-off on the side of the new building facing Garfield. The attorney for the church commented that the church had not sought the amendments and was concerned that if the special use were granted with the amendments, the church could be criticized in the future for not having enough parking. The attorney for the McCues stated that they would support granting the special use with the proposed amendments. The city council then voted in favor of the motion to amend. The city attorney stated that she interpreted the vote to amend as the

equivalent of attaching conditions to the special use permit, and she advised that a two-thirds majority would need to vote to grant the special use permit with the conditions. The city council voted seven to five in favor of the special use permit with the conditions. Accordingly, it failed to get the required supermajority. The city council then voted on the special use without any conditions (the church's original proposal, with the parking lot, driveway, and covered drop-off included), but that also failed to get the necessary votes, failing by a six-to-six vote. Thus, neither version of the special use permit was granted.

On February 14, 2006, the city council voted unanimously to suspend the rules and reconsider the special use permit application of Our Savior, but only with the conditions added by the city council at the January 24, 2006, meeting (no parking lot or driveway; the covered drop-off could be built but only on the Garfield side of the new building). The council then voted to table the matter for two weeks. On February 28, 2006, the city council voted nine to three to grant the special use subject to those conditions.

Proceedings in the Trial Court

On February 22, 2006, less than a month after the city council had voted to deny both versions of Our Savior's special use permit application (and before the city council voted upon reconsideration to grant the amended special use), the church filed a three-count complaint in the circuit court of Kane County. Count I, filed pursuant to the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2006)), asserted that the ZBA erred in deciding that the church could not use the site plan review process. Count II, seeking review via a writ of certiorari, alleged that the city council erred in denying a special use permit on January 24, 2006. Count III sought a declaratory judgment that the city's actions violated the Illinois Religious Freedom Restoration Act (775 ILCS

35/1 et seq. (West 2006)). The church filed separate motions for judgment on the pleadings on count I and count II, both of which the trial court denied, finding that material questions of fact existed regarding each of these claims. On November 29, 2007, the trial court granted judgment for the city on all counts in a letter ruling, stating as follows:

"The Court finds that the position of the City taken in its papers filed herein November 15, 2007, is the correct legal position.

The Court personally believes that the decision of the city in the proceedings below was poorly reasoned, is bad not only for Our Savior Evangelical Lutheran Church [and] the surrounding neighborhood but also the community at large. However, under the applicable law this Court cannot review the evidence and substitute its judgment for that of the City Council. This Court cannot say that the decision of the Aurora City Council is contrary to the manifest weight of the evidence and therefore the decision of the City Council of Aurora in this matter is affirmed."

The church filed a motion for reconsideration, which the trial court denied. This appeal followed.

LEGAL ANALYSIS

On appeal, the church raises two issues: the propriety of the city's refusal to allow the church to use the site plan review process, and the city council's denial of the church's special use permit. We review each issue separately.

The ZBA's Refusal to Allow Site Plan Review

In arguing that the ZBA improperly denied it the opportunity to utilize the site plan review procedure contained in section 5.14--2(h) of the AZO, the church is not disputing that it does not meet section 5.14--2(e)'s requirement that it be located on an arterial or major collector street.

Rather, the church contends that section 5.14--2(e) should be stricken from the AZO because it violates church members' first amendment rights to the free exercise of their religion, by discriminating on its face against churches and also as applied to Our Savior in this case. The church also contends that section 5.14--2(e) violates the Illinois Religious Freedom Restoration Act (775 ILCS 35/1 et seq. (West 2006)). We reject all of these arguments, for the following reasons.

The free exercise clause of the first amendment to the United States Constitution (U.S. Const., amend. I), made applicable to state and local governments by the fourteenth amendment (U.S. Const., amend. XIV), provides that no law may prohibit the free exercise of religion. The United States Supreme Court has held that, where a burden on religious exercise is an incidental effect of a neutral, generally applicable, and otherwise valid law or regulation, the law does not violate the free exercise clause. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 124 L. Ed. 2d 472, 489, 113 S. Ct. 2217, 2225 (1993); Employment Division, Department of Human Resources v. Smith, 494 U.S. 872, 878, 108 L. Ed. 2d 876, 885, 110 S. Ct. 1595, 1599-1600 (1990). A law is not neutral if it is intended "to infringe upon or restrict practices because of their religious motivation." Hialeah, 508 U.S. at 533, 124 L. Ed. 2d at 490, 113 S. Ct. at 2227. If the law is hostile to the free exercise of religious beliefs, it must be justified by a compelling governmental interest and be narrowly tailored to that interest. Hialeah, 508 U.S. at 533, 124 L. Ed. 2d at 490, 113 S. Ct. at 2227. Laws are presumed constitutional and the party challenging a law's validity bears the burden of demonstrating a clear constitutional violation. In re Lakisha M., 227 Ill. 2d 259, 263 (2008). We review the constitutionality of a law de novo. Lakisha M., 227 Ill. 2d at 263.

Here, the AZO as a whole is a facially neutral law. It initially permitted churches as special uses in all zoning classifications, like other, nonreligious uses such as schools, day-care centers, and most public buildings that are also permitted solely as special uses. The mere inclusion of churches within a group of similar uses that must seek special use permits is not sufficient to show facial discrimination against religious uses. Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 763 (7th Cir. 2003). In 1986, the AZO was amended to add section 5.14, under which churches did not need to seek special use permits if they met the listed requirements of sections 5.14--2(b) through (f), which relate to setbacks, green space, parking, etc. Instead, a church meeting the requirements could proceed under the less onerous and less discretionary site plan review process. Aurora Zoning Ordinance §5.14--2(h) (2005). Under that process, once the planning and development committee of the city council determines that the site plan is in compliance with the standards of section 5.14--2, the zoning administrator "shall forthwith issue a building permit." Aurora Zoning Ordinance §5.14--2(h)(4) (2005).

Our Savior argues that the requirement contained in section 5.14--2(e), that churches abut major or arterial streets, discriminates on its face against churches, imposing a substantial burden on churches that is not imposed on any other, nonreligious use. But section 5.14--2(e) must be viewed within the context of section 5.14 as a whole. It is apparent that the overall effect of section 5.14 is to grant churches a benefit, the opportunity to bypass the special use application process that other, nonreligious land uses must go through. That this benefit is available only to those churches that meet the listed requirements, including section 5.14--2(e), does not demonstrate any hostility to religion, but only the city's desire to ensure that the use of the site plan review process does not unduly interfere with the overall goals of the AZO, which include the minimization of traffic

congestion. See Aurora Zoning Ordinance §2.1--7 (2006) (as recodified in 2006) (among the purposes of the AZO is to "limit congestion in the public streets"). The church has not cited any legal support, nor can we find any, holding that it is a violation of the free exercise clause to condition a benefit on restrictions that do not themselves disclose any hostility to religious conduct. We hold that section 5.14--2(e) does not discriminate on its face against churches.

The church also argues that section 5.14--2(e) was applied in a manner that discriminated against Our Savior. It contends that concerns regarding traffic congestion were the presumable reason for section 5.14--2(e)'s requirement that churches be located on major or arterial streets. However, the city has stated that it did not believe that Our Savior's expansion plans would create any traffic problems. Thus, argues the church, the city should have permitted Our Savior to use the site plan review process despite the fact that it was not located on a major or arterial street.

Section 5.14 provides that churches may use the site plan review process only if they meet all of the requirements of sections 5.14--2(b) through (f). See Aurora Zoning Ordinance §5.14--2(h) (2005). The ordinance does not grant the zoning administrator or other city officials the power to waive any of these requirements. Instead, if a church cannot comply with all of the requirements, section 5.14--3 permits it to file an application for a special use permit that includes a variance from the requirements. Aurora Zoning Ordinance §5.14--3 (2005). The determination that noncomplying churches should submit to the special use permit process rather than seek waivers on a case-by-case basis is not irrational. And, as noted above, nonreligious uses similar to churches must utilize the special use permit process. There is no indication in the record that city officials applied the provisions of section 5.14 in a manner that discriminated against Our Savior. Accordingly, we reject the church's as-applied challenge to section 5.14--2(e).

Our Savior next argues that section 5.14--2(e) violates the Illinois Religious Freedom Restoration Act (Act) (775 ILCS 35/1 et seq. (West 2006)). However, its argument is refuted by the language of the Act itself. Section 15 of the Act (775 ILCS 35/15 (West 2006)) provides that "[g]overnment may not substantially burden a person's exercise of religion." We have already concluded that section 5.14--2(e) imposes a reasonable limitation on a benefit the government has conferred on churches, not a "substantial burden" on churches or their members. In addition, section 25 (775 ILCS 35/25 (West 2006)) provides that "[g]ranting government funding, benefits, or exemptions *** does not constitute a violation of this Act." (Emphasis added.) As discussed, the overall effect of section 5.14 is to confer a benefit on churches that meet the requirements of sections 5.14--2(b) through (f), exempting them from the usual special use permit application process. Under the plain language of the Act, that decision "does not constitute a violation of" the Act.

This is not to say that the AZO does not impose any burdens on churches or that all of those burdens are rational on their face. At several points in its briefs, the church mentions that, several years before, the city granted a developer permission to build 18 two-story townhouses even nearer to the Copley Mansion than the proposed driveway. The church suggests that it is arbitrary or inequitable that the AZO requires Our Savior to obtain a special use permit in order to construct a parking lot, but it would have permitted a developer to construct a multistory apartment building on the same lot, even though the apartment building would have had a greater negative impact on the historic ambience of the neighborhood. However, the rationality of the AZO as a whole is not before us, and the particular facet of the AZO that the church challenges--the restrictions on the availability of the site plan review procedure--does not violate either the free exercise clause or the Act.

Finally, the church argues that an alternate basis raised by the city for its refusal to allow Our Savior to use site plan review--the existence of a 1993 special use permit for a project that was never developed--is specious. We need not reach this argument, as we have found the city's determination justified by the fact that Our Savior's application did not meet the requirements of section 5.14--2. None of the church's challenges to section 5.14 have merit, and we affirm the ZBA's denial of Our Savior's site plan review application and the trial court's judgment in favor of the city on counts I and III of the complaint.

The Special Use Permit Decision

Before proceeding to the arguments raised on appeal with respect to Our Savior's challenge to the city council's decision on its application for a special use permit, we must first address a preliminary matter: the nature of the city council's actions with respect to that application. Did the city council deny the application, grant it with conditions, or take some other action? The resolution of that question affects our analysis of the merits of the appeal, and so we asked the parties to provide supplemental briefing on the issue. We now consider the pertinent facts in some detail.

On January 24, 2006, the city council voted to deny Our Savior's application for a special use permit to construct an addition to the church building, a driveway, a new parking lot, and a covered drop-off at the edge of the addition located along the new driveway. That same night, the city council also voted on whether to approve a special use permit that would allow Our Savior to build the addition to the church building and to construct a covered drop-off in the church's existing parking lot, but not to build the driveway or the new parking lot. This second proposal, which the city refers to as the "amended special use permit," was not submitted by the church, but rather was recommended by city staff. The amended special use proposal carried by a simple majority but

failed to get enough votes for the required supermajority. Three weeks later, on February 14, 2006, the city council voted to suspend their rules of procedure and reconsider the amended proposal. On February 28, 2006, the city council held another vote on the amended proposal and approved it by the necessary supermajority.

On February 22, 2006, after the city council's vote to reconsider the amended proposal but before the actual reconsideration of that proposal, Our Savior filed suit in the circuit court. Among other things, the complaint alleged that on January 24, 2006, the city council denied Our Savior's application for a special use permit. On April 28, 2006, the city filed its answer, in which it admitted that allegation. The city also filed the administrative record, in which the most recent items included were the transcripts and minutes of the January 24 meetings of the city council and the committee of the whole. Thus, neither the answer nor the administrative record filed by the city contained any suggestion that the council's denial of the church's special use permit application on January 24 had been superseded by its vote on February 28.

On August 26, 2006, the city filed a motion to supplement the record in the trial court to include the minutes of the city council meetings of February 14 and 28, 2006. The record does not establish whether this motion was granted. It appears (based on comments in later briefs filed by the parties) that on August 29, 2006, the trial court and the parties discussed the city council's February 28, 2006, action. However, there is no indication that any of the parties thought that the city council's February 28 action affected the legal grounds for the church's lawsuit, and the trial court seems to have treated it as a nullity. The trial court issued letter rulings on October 30, 2006, and July 11, 2007, that did not mention the council's February 28 action and identified the council's January 24 denial of the special use permit as the city's action at issue in the lawsuit.

The trial court ruled in favor of the city, stating that it was adopting the arguments raised in the city's brief. In that brief, the city confusingly both (1) asserted (apparently for the first time) that the city council did not deny the church's application for a special use permit but instead granted it with conditions and (2) referred to the council's decision as "denying" the church's application. The trial court did not make a factual finding on whether the city council granted or denied the application. Neither the church's motion to reconsider the judgment nor the order denying that motion mentioned the issue.

The parties' briefs on appeal did not resolve the issue, either. In the statement of facts in its opening brief, Our Savior omitted any mention of the city council's February 2006 actions. In the city's brief, it set out its own statement of facts, in which it stated that the city council had approved the church's application with "conditions," including the removal of the parking lot, driveway, and covered drop-off. However, the portion of the record to which the city cited did not refer to the council's February 14 or 28 meeting. (The minutes from those meetings are included in a portion of the record not cited by the city anywhere in its brief.) The city also mistakenly stated that the city council voted on January 24, 2006, to grant the amended special use permit, when in fact the council denied the amended proposal on that date. In its reply brief, the church acknowledged the council's actions on February 14 and 28, 2006, and argued that the council's reconsideration and approval of the amended special use permit amounted to an illegal grant of a variance (in the parking requirements) that had been neither requested by the church nor properly heard and acted upon by the ZBA. Faced with this morass, we ordered supplemental briefing on several issues, including whether the February 28, 2006, action was a grant or a denial of the church's application for a special use permit; whether the February 28, 2006, action was a valid exercise of the city's municipal

powers; and whether the city council's February 2006 actions rendered the church's lawsuit either premature or moot.

The key to all of these issues is the nature of the city council's action on February 28, 2006, granting a special use permit that would allow Our Savior to construct the building addition but not the remainder of its planned construction. In its supplemental briefs, Our Savior argues that the city's February 2006 actions related only to the amended proposal advanced by the city staff, and not to the church's own application for a special use permit, which the city denied on January 24, 2006. We think this argument has force. The proposal to grant a special use permit for only one of the four features sought by the church came from city staff, not from the church, and the church did not support this proposal. The city argues that Our Savior sought reconsideration of this proposal on February 28, 2006, and that it got what it wanted, but the record does not confirm this assertion. Although the city's proposal for a modified special use permit was subject to commentary from the parties' attorneys and the public on several occasions, including the November 2005 hearing before the planning commission, the December 2005 meeting of the planning and development committee, and the city council meetings on January 24 and February 28, 2006, the record does not reflect that any of the church's witnesses, including its attorney, ever voiced support for the city's proposal. (The minutes of the February 28, 2006, council meeting show that the church's attorney and two of its employees addressed the council, but they do not indicate the substance of their statements.)

The city argues that, under the AZO, the city council had the power not only to grant or deny a special use permit application, but also to grant an application with conditions. Specifically, section 14.6--8 of the AZO provides that the city may impose any "conditions and restrictions upon the establishment, locations, construction, maintenance and operation of the special use as deemed

necessary for the protection of the public interest." Aurora Zoning Ordinance §14.6--8 (2005). The city argues that its action on February 28, 2006, must be viewed as granting Our Savior's application for a special use permit with the conditions that Our Savior not construct the driveway or new parking lot, and could locate the covered drop-off only in the old parking lot. Our Savior argues that these "conditions" changed the church's proposal in such a drastic manner as to amount to a denial: over half of the square footage of the proposed project was removed, and other aspects of the remaining planned renovations to the church building itself were affected (for instance, the church had planned to turn the sanctuary around so that people entering at the new drop-off on the southwest corner of the church would be entering at the back of the sanctuary instead of the front; but without the driveway and drop-off, that would no longer be necessary or desirable).

This debate is irrelevant, however, because it ignores the fact that the city's eventual grant of the amended proposal was a separate action from its denial of Our Savior's original application for a special use permit. This point was made by one of the city's own attorneys during the city council meeting on January 24, 2006:

"MR. MALINA [an attorney hired by the city's corporation counsel to work on the application by Our Savior]: You have before you under your ordinance a special use petition and part of your right and duty as a City Council when you get a special use petition is to consider three options under the code. Those are approval as-is, approval with conditions[,] or a denial. In making that decision, you are supposed to consider what is in the best interest of the public. You know what you are supposed to consider.

The way I understand the amendment, you really can't amend their special use petition. They have the right to, to call it and design it however they want; but you do have

the right to say, I can't vote to approve this as it is presented. I do want to, I would vote to approve it and move to approve it, but with these added conditions."

The attorney went on to advise the city council that the vote on the amended special use petition would not remove the need for a vote on Our Savior's original application: "You wouldn't disallow it based on the earlier vote because there are really two separate types of approval."

Just as the city's attorney said, the "amendment" of the church's application for a special use permit created a new proposal, the amended proposal. It did not, however, void the church's original application, which was also pending before the city council. On January 24, 2006, neither proposal received enough votes to satisfy the requirement of a supermajority, and thus both proposals were denied. Although the city council later reconsidered the amended proposal and granted it, that action did not affect their earlier denial of the church's original application. It is undisputed that Our Savior's application for a special use permit in its original form was not brought before the city council at any time after January 24, 2006, and that the only proposal considered by the city council on February 28, 2006, was the amended proposal advanced by city staff. That being so, the church's lawsuit challenging the denial of its original application was neither premature nor moot.

Standard of Review

We next consider the standard of review to be applied to the city's denial of Our Savior's application for a special use permit. In People ex rel. Klaeren v. Village of Lisle, 202 Ill. 2d 164, 183 (2002), the supreme court held that zoning hearings regarding special use applications are administrative or quasi-judicial. After Klaeren was issued, courts began applying the principles and standards of administrative review to appeals of special use permit decisions. See, e.g., Gallik v. County of Lake, 335 Ill. App. 3d 325, 329 (2002). The legislature has sought to return to the pre-

Klaeren standard of review through a series of amendments to the Illinois Municipal Code and the Illinois Counties Code. The first set of amendments, effective on July 14, 2006 (the 2006 amendments), provided that "[a]ny special use, variance, rezoning, or other amendment to a zoning ordinance adopted by" the local governmental authorities "shall be subject to de novo judicial review as a legislative decision, regardless of whether the process of its adoption is considered administrative for other purposes." 55 ILCS 5/5--12012.1 (West 2006); 65 ILCS 5/11--13--25 (West 2006). In Millineum Maintenance Management, Inc. v. County of Lake, 384 Ill. App. 3d 638, 645 (2008), we held that under the express command of the statutory language, this provision applied only to the "adoption" or grant of a special use permit, and not to the denial of one. Thereafter, the legislature enacted a set of amendments to the Municipal Code and the Counties Code, effective January 1, 2009 (the 2009 amendments), which removed the earlier restriction, providing that "[a]ny decision" by the municipal or county authorities "in regard to any petition or application for a special use *** shall be subject to de novo judicial review as a legislative decision." Pub. Act 95--843, §5, eff. January 1, 2009 (amending 55 ILCS 5/5--12012.1 (West 2006)); Pub. Act 95--843, §5, eff. January 1, 2009 (amending 65 ILCS 5/11--13--25 (West 2006)).

In ruling on the merits of Our Savior's challenge to the denial of its application for a special use permit, the trial court applied a standard of review appropriate for administrative review: an administrative agency's factual findings are upheld unless they are against the manifest weight of the evidence, the agency's findings on a question of law are reviewed de novo, and the agency's resolutions of mixed questions of fact and law are upheld unless they are clearly erroneous. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205 (1998). Under the holdings of Klaeren and Millineum Maintenance, this was the correct standard for the trial court to apply in

reviewing a denial of a special use permit. During the pendency of this appeal, however, the legislature enacted the 2009 amendments, so the relevant provision of the Municipal Code provides for "de novo judicial review" of such a decision. Pub. Act 95--843, §5, eff. January 1, 2009 (amending 65 ILCS 5/11--13--25 (West 2006)). We therefore consider whether we should apply the de novo standard of review to this appeal and, if so, what that means in practice.

When a relevant law has changed during the pendency of an appeal, "a reviewing court should apply the law as it exists at the time of the appeal unless doing so affects a vested right." People v. Rodriguez, 313 Ill. App. 3d 877, 885 (2000). In Millineum Maintenance, we considered whether the legislature's changes in the type of review applicable to grants of special use permits affect any vested or substantive rights, and we concluded that they do not. Millineum Maintenance, 384 Ill. App. 3d at 655. In doing so, we interpreted the 2006 amendments to the Counties Code to "limit[] only the mode of direct judicial review over the listed zoning decisions, not the application of due process to any of those *** decisions." Millineum Maintenance, 384 Ill. App. 3d at 654-55. We see no reason why the 2009 amendments to the Municipal Code and the Counties Code, requiring that all zoning decisions be subject to "de novo judicial review as *** legislative decision[s]," would be interpreted any differently.

Thus, we hold that the requirements of the amended Municipal Code apply here, and the city's denial of Our Savior's special use permit application must receive "de novo judicial review as a legislative decision." Pub. Act 95--843, §5, eff. January 1, 2009 (amending 65 ILCS 5/11--13--25 (West 2006)). This "de novo judicial review as a legislative decision" is not the familiar de novo standard of appellate review generally applicable in appeals of purely legal issues, grants of summary judgment, and so on. Millineum Maintenance, 384 Ill. App. 3d at 653. Indeed, it is not a standard

of appellate review at all. Rather, it describes a wholly new action under which a plaintiff may challenge a zoning decision in the same manner that a plaintiff may challenge a legislative action. Thus, "the 'de novo' language indicates that, unlike typical administrative review, evidence outside the already-developed [administrative] record may be presented to the trial court." Millineum Maintenance, 384 Ill. App. 3d at 653. This additional evidence is allowed because the "de novo judicial review as a legislative decision" does not consider whether the agency decision was correct or incorrect: it considers the entirely new question of whether the zoning decision should be upheld under the same standards applied when legislative decisions are challenged. Although a legislative action may be challenged on several bases, the most common challenge in the context of zoning cases is one based on substantive due process. Under such a challenge, a court considering a zoning decision "de novo *** as a legislative decision" will examine the zoning action " 'for arbitrariness as a matter of substantive due process under the six-part test set forth in La Salle National Bank v. County of Cook, 12 Ill. 2d 40 (1957),' " and any evidence received by the court must relate solely to those factors. Millineum Maintenance, 384 Ill. App. 3d at 652-53, quoting City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc., 196 Ill. 2d 1, 14 (2001).

The difficulty in reviewing the zoning decision here as a legislative decision is, of course, that the procedural history of this case was built on the law applicable at the time, which held that decisions regarding special use permits were to be reviewed as administrative decisions under the strictures of the Administrative Review Law. Klaeren, 202 Ill. 2d at 183; Gallik, 335 Ill. App. 3d at 329. Those strictures not only prescribed the standard of review to be applied, but also mandated that the record before the trial court was limited to only those materials and evidence submitted

during the administrative proceedings. See, e.g., 735 ILCS 5/3--108, 3--110 (West 2008). Accordingly, in the trial court, both parties and the court proceeded as if the only issue before the court was whether the administrative record demonstrated that the city council's ultimate decision was against the manifest weight of the evidence. As a result, the record before us on appeal does not contain either evidence on the La Salle factors or arguments related to whether the denial of the special use permit complied with substantive due process. Thus, in order to allow the parties to address the zoning decision de novo as a legislative action, we must remand the case for further proceedings on these issues.

The city argues that the church's failure to present such arguments or evidence amounts to a concession that "de novo judicial review as a legislative decision" does not apply and a forfeiture of the church's ability to advance any arguments or evidence related to the La Salle factors. As to the first point, the parties cannot through their actions dictate the law to be applied to their case. Both parties now apparently would prefer to proceed as if the case were subject to administrative review. The language of section 11--13--25 is both clear and mandatory, however: zoning decisions such as this one "shall be subject to de novo review as a legislative decision." Pub. Act 95--843, §5, eff. January 1, 2009 (amending 65 ILCS 5/11--13--25 (West 2006)). We are bound to follow the will of the legislature in this regard unless the statute is unconstitutional, and we have already held that it is not. Millineum Maintenance, 384 Ill. App. 3d at 654-55. As to the city's forfeiture argument, forfeiture is a limitation on the parties, not on the court, and the court may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent. In re Marriage of Holthaus, 387 Ill. App. 3d 367, 377 (2008). Moreover, where a party has argued before the trial court in accordance with then-existing binding precedent, it would be inequitable to hold that the party has

forfeited an argument based on new law that has since come into being. See DeSaga v. West Bend Mutual Insurance Co., 391 Ill. App. 3d 1062, 1070 (2009); see also O'Casek v. Children's Home & Aid Society, 229 Ill. 2d 421, 438-39 (2008) (new arguments not prohibited where statute was amended during pendency of case and application of amendments was the subject of a split among the appellate courts). Thus, the church's failure to raise before the trial court arguments related to substantive due process, which the trial court would have been bound to dismiss under then-existing law, does not prevent it from raising such arguments after the law has changed. O'Casek, 229 Ill. 2d at 439.

On remand, the trial court will have the opportunity to determine whether the city's denial of the church's special use permit passes muster as a legislative decision, that is, whether it complies with substantive due process (or any other barriers to legislative action). The Illinois Supreme Court recently explored the nature of this determination in Napleton v. Village of Hinsdale, 229 Ill. 2d 296 (2008). The court affirmed that the appropriate test under this standard is the deferential "rational basis" test, under which a court must consider whether the challenged enactment is reasonable and not arbitrary. Napleton, 229 Ill. 2d at 313. However, the court also held that, in as-applied challenges such as this one, courts could continue to use the La Salle factors as a means of determining whether the zoning action was rational in light of the specific facts of the case. Napleton, 229 Ill. 2d at 318. The supreme court explained:

"The difference between a facial and an as-applied zoning challenge is significant: a zoning ordinance that may be valid in its general aspects may nevertheless be invalid as to a specific parcel of property because the balance of hardships--the gain to the public in general against the detriment to the individual owner--overwhelmingly burdens the

individual owner. [Citation.] In light of this possibility, the La Salle opinion set forth a list of factors that may be relevant in an as-applied challenge to assist in balancing the gain to the public against the specific burdens experienced by an individual property owner." Napleton, 229 Ill. 2d at 318.

In addition to the six factors listed in La Salle, courts have identified other factors that may be relevant to the analysis in certain cases. See Napleton v. Village of Hinsdale, 374 Ill. App. 3d 1098, 1106 (2007), aff'd, 229 Ill. 2d at 321. Provided that they are relevant to the case at hand, these factors are equally applicable in an as-applied challenge.

The judgment of the circuit court of Kane County is therefore affirmed as to counts I and III, relating to the site plan review process. The judgment of the circuit court as to count II is hereby reversed and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

BOWMAN and O'MALLEY, JJ., concur.