# Illinois Official Reports

## Appellate Court

---

**Conaghan v. City of Harvard, 2016 IL App (2d) 151034**

---

| | |
|---|---|
| Appellate Court Caption | STEVEN CONAGHAN and BERTRAM P. IRSLINGER, Plaintiffs-Appellees, v. THE CITY OF HARVARD; THE HARVARD CITY COUNCIL; and THE PLANNING AND ZONING COMMISSION OF THE CITY OF HARVARD, Defendants-Appellants. |
| District & No. | Second District<br>Docket No. 2-15-1034 |
| Filed | August 31, 2016 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 13-MR-399; the Hon. Michael T. Caldwell, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | K. Austin Zimmer and Timothy A. Woerner, both of Del Galdo Law Group LLC, of Berwyn, for appellants.<br><br>John W. Gaffney, of Harvard, for appellees. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Steven Conaghan purchased a house in Harvard, renting it out to separate tenants on the two floors as a legal nonconforming use. After property damage rendered it uninhabitable, Conaghan hired a contractor to rehabilitate the property. The contractor's permit lapsed, and the property remained vacant for more than a year. Acting on the recommendation of defendant the Planning and Zoning Commission of the City of Harvard (Zoning Commission), defendant Harvard City Council (City Council) passed an ordinance denying the petition of Conaghan and plaintiff Bertram P. Irslinger, who had become the property's joint owner, to allow the continued use of the property as a multifamily residence. The City Council declared that the nonconforming use had been discontinued, and it restricted the use of the building to a single-family residence. Plaintiffs filed a complaint against the Zoning Commission, the City Council, and defendant City of Harvard (City), under section 11-13-25 of the Illinois Municipal Code (65 ILCS 5/11-13-25 (West 2012)), challenging the City Council's act.

¶ 2    The trial court held that the denial of the petition was arbitrary and capricious and that plaintiffs were entitled to continue the nonconforming use. Defendants appeal, contending that (1) section 11-13-25 of the Municipal Code does not create a private right of action by a landowner against a municipality; (2) even if section 11-13-25 does create such a right of action in some instances, it does not here; and (3) the court erred on the merits of plaintiffs' claim. We agree with defendants' first argument and do not reach the others. We reverse.

## I. BACKGROUND

¶ 4    Plaintiffs' complaint alleged as follows. In 2008, Conaghan purchased the building at 206 East Diggins Street in Harvard. He operated it as a two-unit rental residence, a legal nonconforming use under the pertinent ordinance (Harvard Municipal Code § 17.48.040 (amended Jan. 19, 1999)), renting out the upper and lower levels separately. In January 2010, the lower-level tenant vacated the property and, shortly afterward, so did the upper-level tenant. Before they left, however, they had caused pipes to freeze, producing extensive water damage to both levels. Conaghan, with financing from Irslinger, who became part owner, continued to maintain the property. Upon discovering the damage in February 2010, plaintiffs contacted their insurance company and began work to make both levels inhabitable.

¶ 5    The complaint continued as follows. Through their mortgage lender, plaintiffs hired a general contractor to repair the property. The contractor and the insurance company had a falling out over the release of funds to pay for the repairs; as a result, the repairs slowed down. As of July 17, 2012, though, they were complete for the upper unit and about 90% complete for the lower unit. On that date, a City zoning officer issued an opinion that, because the property had been vacant for more than 12 months, the previous multifamily use had been discontinued, as dictated by the pertinent ordinance. As pertinent here, the ordinance states:

> "Whenever a non-conforming use of a building or structure, or part thereof, has been discontinued for a period of 12 months or whenever there is evident a clear intent on the part of the owner to abandon a non-conforming use, such use shall not, after being discontinued or abandoned, be re-established, and the use of the premises thereafter shall be in conformity with the regulations of the district." Harvard Municipal Code § 17.48.040(D)(1), *added by* Harvard Municipal Ordinance No. 99-102, § 1 (1999).

¶ 6 On May 17, 2013, plaintiffs petitioned the Zoning Commission to maintain the multifamily use of the property. The Zoning Commission recommended to the City Council that the petition be denied. On June 25, 2013, the City Council did so. Harvard Municipal Ordinance No. 2013-115 (approved June 25, 2013).

¶ 7 Plaintiffs claimed that the denial of the petition was improper because they had neither discontinued the nonconforming use of the building as a multifamily residence nor shown a clear intent to do so. Plaintiffs asserted that section 11-13-25 of the Municipal Code provided for *de novo* judicial review of the City's decision. Section 11-13-25 is part of article 11 ("Corporate Powers and Functions"), division 13 ("Zoning"), of the Municipal Code. It is entitled "Actions subject to de novo review; due process," and it reads:

> "(a) Any decision by the corporate authorities of any municipality *** in regard to any petition or application for a special use, variance, rezoning, or other amendment to a zoning ordinance shall be subject to de novo judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrative for other purposes. Any action seeking the judicial review of such a decision shall be commenced not later than 90 days after the date of the decision.

> (b) The principles of substantive and procedural due process apply to all stages of the decision-making and review of all zoning decisions." 65 ILCS 5/11-13-25 (West 2012).

¶ 8 Defendants moved to dismiss the complaint (see 735 ILCS 5/2-619(a)(9) (West 2014)), arguing first that section 11-13-25 of the Municipal Code does not provide a private right of action to challenge a municipal zoning decision. Defendants relied on *Dunlap v. Village of Schaumburg*, 394 Ill. App. 3d 629 (2009), in which the First District held that section 11-13-25 was intended not to expand landowners' rights to sue municipalities but only to clarify the standard of review for actions that are already properly in court. *Id.* at 642. Defendants argued second that, even if section 11-13-25 creates a new private right, the challenged action did not involve a petition or application for a special use, variance, rezoning, or other amendment to a zoning ordinance.

¶ 9 Plaintiffs responded that *Dunlap* did not apply because this court had held that section 11-13-25 does create a private right of action against a municipality's zoning decision and does not merely specify standards of review. See *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill. App. 3d 1003, 1027 (2009). Further, they argued, denying them a right of action under this section would leave them without a remedy, as the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)) applies only to decisions by administrative bodies and not to a municipal council's legislative act (*Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 253-54 (2003)). Also, plaintiffs contended, their action was within the statutory language, because defendants had denied them a special-use permit and they had been seeking an amendment to the zoning ordinance to allow the special use.

¶ 10 The trial court denied the motion to dismiss. Defendants answered the complaint, asserting as an affirmative defense that section 11-13-25 did not give plaintiffs a private right of action. Defendants then moved for summary judgment (735 ILCS 5/2-1005(c) (West 2014)), arguing that, under *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40 (1957), the denial of the nonconforming use was not arbitrary and capricious. The court denied the motion and held a trial on plaintiffs' complaint.

¶ 11     The parties first stipulated to the following facts. Plaintiffs jointly own the property at 206 East Diggins. Conaghan purchased it in 2008. Before and after the purchase, the property was a multifamily rental residence, a legal nonconforming use. Plaintiffs rented out the upper and lower levels as two separate properties until January 2010, when the lower-level tenant vacated the property. The upper-level tenant also did so shortly afterward. On July 17, 2012, a zoning officer for the City issued an opinion that plaintiffs' use of the property as a multifamily residence had been discontinued because the property had been vacant for more than 12 months, and thus the use was no longer permitted. On May 17, 2013, plaintiffs petitioned the Zoning Commission to maintain the nonconforming use. The Zoning Commission recommended that the petition be denied. On June 25, 2013, the City Council denied the petition.

¶ 12     Next, the parties stipulated to the admission of eight exhibits. Plaintiffs' first exhibit was a certificate of occupancy that the City issued on June 30, 2011. The document states that a building permit was issued on July 14, 2010, to repair water damage. The certificate was signed by Steve Santeler, the City's community development director who oversaw the building department and code enforcement. Santeler wrote "upper unit completed" and placed an "x" next to "final [occupancy]" (as opposed to "temporary" or "partial"). Plaintiffs' second exhibit was a group of photographs of the lower level of the building in June 2011.

¶ 13     Defendants introduced the following exhibits: (1) the nonconforming-use ordinance (Harvard Municipal Code § 17.48.040 *et seq.* (amended Jan. 19, 1999)); (2) the minutes of the Zoning Committee meeting of June 4, 2013; (3) the building permit issued to Conaghan, signed by Santeler, and dated July 14, 2010, allowing repair and remodeling necessitated by water damage; (4) a letter dated July 17, 2012, from Clayton Brennecka to Conaghan, serving as "formal notice that the multi-family, non-conforming residential use" of 206 East Diggins had been "discontinued" and was no longer permitted, because the property had been vacant for more than 12 months; (5) a letter dated April 5, 2013, from Santeler to Conaghan, stating that the property had lost its legal nonconforming use as a two-family residence and must be converted to a single-family home; and (6) ordinance No. 2013-115, dated June 25, 2013, denying plaintiffs' petition.

¶ 14     Plaintiffs then called Conaghan, who testified as follows. In 2008, he acquired the property with the intent to continue its use as a "two-flat unit," renting out both levels. At the time, the two levels had separate entrances and gas and electrical service, although they shared water service. In February 2010, after two continuous years of separate rentals, a second-floor pipe burst, flooding the top floor and causing leaks that "destroyed" the lower level. The insurance company paid Conaghan about $50,000 to repair the damage.

¶ 15     Conaghan testified that, in July 2010, he hired a contractor to make repairs at a projected cost of $117,000. The building was essentially gutted. Conaghan intended to keep using the building as a multifamily residence. He supervised the repairs by meeting monthly with the contractor and immediately updating the insurance company. The insurance company released money "a little bit at a time as [Conaghan] met each phase of the project." Conaghan and the contractor made the repairs so as to maintain the building's character as a multifamily residence: they kept the utilities, furnaces, water tanks, and electrical panels separate.

¶ 16     Conaghan testified that, at some point, the contractor slowed work down because the insurance company was withholding money out of dissatisfaction with the condition of the repairs. During 2010 and until June 2011, as the repairs were underway, nobody from the City

raised any objection to his goal of maintaining the property as a multifamily residence. By June 2011, the repairs to the second floor, which the contractor had begun first, were complete. In that month, a City officer inspected the building and Conaghan applied for an occupancy permit. At trial, Conaghan identified plaintiffs' exhibit No. 1 as the permit for the "final" (but not "partial") occupancy of the building, dated June 30, 2011. When the permit was issued, nobody from the City objected to the use of the building as a multifamily residence. Believing that he did not need a separate occupancy permit for the first floor, Conaghan continued the work on that level, which involved "[f]inal trim, simple painting, [and] doorknobs." The City did not object to his continuing the repairs with the intent to maintain the multifamily use of the building.

¶ 17 Conaghan testified that Irslinger stepped in to fund the project after the insurance company stopped releasing money. In June 2012, when the repairs to the lower level were about 90% complete, Irslinger applied for a permit to replace the building's fascia and roof but was told that the City would not grant plaintiffs an occupancy permit for the nonconforming use. In March or April 2013, Conaghan met with Santeler. Only then did he learn personally that the City was seeking to deny the multifamily use. After the meeting, plaintiffs filed their petition, appeared before the Zoning Commission, and went in front of the City Council. In June 2013, the City Council denied the petition.

¶ 18 Conaghan testified that, throughout the repair process, he intended to continue using the building as a multifamily residence. Before he met with Santeler, nobody had objected to him about that use of the building. The property was vacant from February 2010 until after the City Council meeting, when a tenant moved into the second floor. Defendants' counsel showed Conaghan the building permit; Conaghan said that he had never seen it before, but he acknowledged that it was issued in July 2010 and was good for one year. He admitted that, when it expired in July 2011, nobody sought an extension.

¶ 19 Conaghan testified that he recognized plaintiffs' exhibit No. 1, the certificate of occupancy, and that it said nothing about the lower-level unit. He reiterated that not until 2013 did he receive notice that the nonconforming use had been lost. Counsel then asked him whether he recognized defendants' exhibit No. 4, the letter dated July 17, 2012, telling him that the nonconforming use had been discontinued. Conaghan said that he had never seen it before. Also, when he sought relief to reestablish the nonconforming use, both levels of the building had been vacant for more than three years.

¶ 20 Conaghan testified that the general contractor applied for the building permit and assured Conaghan that he would take care of it. The contractor stopped work in about June 2011 because, he claimed, the insurance company had stopped paying him.

¶ 21 Plaintiffs next called Irslinger, who testified as follows. He became involved with the property in 2013, when he provided financing to Conaghan to complete the rehabilitation. Irslinger intended to help Conaghan preserve the property's use as a multifamily residence and had been under the impression that a final occupancy permit had been issued for the whole building. At the time, he was unaware of any objection the City had to the continuation of that use. Shown the permit issued on June 30, 2011, he testified that the issuer had checked off the space for "final" occupancy but not the one for "partial" occupancy.

¶ 22 Irslinger testified that, in January or February 2013, he spoke to Santeler and requested a building permit to replace the soffit, fascia, and roof. It was then that he was told that the continued use of the property as a multifamily residence was unacceptable. By then, the repairs

to the lower unit were more than 90% complete. The permit was issued, however. Plaintiffs appealed the denial of the nonconforming use to the Zoning Board and then to the City Council. At all times, Irslinger intended to continue the property's use as a multifamily residence.

¶ 23 Irslinger testified that he first inspected the property early in 2013, before he gave Conaghan money. Before then, he had had no idea what the property looked like. Shown defendants' exhibit No. 4, the July 17, 2012, zoning notice, Irslinger testified that he had never seen it before. His attorney had reviewed the recorder of deeds' file for the property, and Irslinger conceded that the notice had been stamped by that office on August 6, 2012, before he had inspected the property. He also agreed that the occupancy permit mentioned that the upper unit was complete but said nothing about the lower unit. After Irslinger testified, plaintiffs rested.

¶ 24 Defendants first called Santeler, who testified as follows. As community development director, he was responsible for enforcing the City's zoning code. The purpose of the nonconforming-use ordinance is to eliminate nonconforming uses in a district, in the interests of public safety and the general welfare. Plaintiffs' use of the property as a multifamily residence was a nonconforming use. The lot, which was on a corner, was approximately 5300 square feet, but the minimum size for a corner lot with a multifamily residence was 14,700 square feet.

¶ 25 Santeler testified that a building permit was issued for the property on July 14, 2010, and was valid for one year. Nobody ever requested an extension. After inspecting the property and finding that there was "quite a bit of work to do" on the lower unit, Santeler issued the certificate of occupancy on June 30, 2011. It was for the upper unit only, as shown by the remark "upper unit completed" and the absence of any corresponding remark about the lower unit. Nobody had requested a certificate of occupancy for the lower unit.

¶ 26 Santeler testified that the July 17, 2012, notice was intended to let Conaghan know that the nonconforming use was no longer available, because the first floor, at least, had been vacant for 12 months or more. To the best of Santeler's knowledge, the notice was mailed to Conaghan. It was also filed with the recorder of deeds' office. Between June 30, 2011, and July 17, 2012, neither plaintiffs nor the contractor contacted Santeler about the property. Between February 2010 and July 17, 2012, Conaghan never contacted Santeler about any of the hardships that he had described in his trial testimony. After Santeler issued the notice, plaintiffs' contractor had complained to him about it, but nobody had filed for an extension of the building permit.

¶ 27 Santeler identified defendants' exhibit No. 5 as his letter of April 5, 2013, to Conaghan, stating that the property had lost its nonconforming use and must be converted to a single-family home. The letter stated that permits were required for the "de-conversion [*sic*]" and that the time limit was a year from "the date of property transfer." Plaintiffs never converted the property and never sought any extension to avoid the loss of the nonconforming use. Between February 2010 and the City Council hearing, the property was not, to Santeler's knowledge, used as a multifamily residence. Santeler identified defendants' exhibit No. 6, ordinance No. 2013-115, which was passed on July 25, 2013. He noted the following statement in the ordinance:

> "The City Council finds that the petitioners failed to show a hardship that merited granting the petition because the situation was created by the petitioners, given the fact

that the Property has remained vacant more than 40 months and no meaningful construction progress occurred to maintain the Property as a multi-family use. In addition, [the] City Council finds that [the] petitioners failed to pursue extensions of the original building permit of July 2010 thereby demonstrating a lack of intent to simply suspend the non-conforming use." Harvard Municipal Ordinance No. 2013-115 (approved June 25, 2013).

¶ 28    Santeler testified that, per the nonconforming-use ordinance, a landowner can lose a nonconforming use either by discontinuing it for 12 months or by evidencing a clear intent to abandon the use. The notice of July 17, 2012, referred to discontinuation but not to evidence of a clear intent to abandon the use; Santeler testified that he had never said that there had been any such intent. He did not know the precise difference between "discontinue" and "abandon"; his notice had cited the ordinance verbatim, and the nonconforming use at issue had been "either discontinued or abandoned."

¶ 29    Santeler testified that the contractor had applied for the building permit and had not applied for an extension. When Santeler inspected the property before issuing the certificate of occupancy, he looked only at the upper unit and not at the lower one. He had never been asked to inspect the lower unit for a certificate of occupancy.

¶ 30    Defendants next called James Carbonetti, who testified as follows. He was the chairman of the Zoning Commission and had presided over its meeting of June 4, 2013, concerning plaintiffs' property. During the meeting, Carbonetti asked plaintiffs whether they had applied for an extension of the building permit; plaintiffs responded that they had not. They also said that the property had been vacant for 40 months. For this reason, the Zoning Commission denied plaintiffs' request to be allowed to use the property as a multifamily residence.

¶ 31    Carbonetti testified that he did not know how long the property had been used as a multifamily residence or whether it had ever been used as a single-family home. After Carbonetti testified, defendants rested.

¶ 32    Conaghan testified in rebuttal as follows. When he purchased the building, he intended to use it as a multifamily residence, and he did so until the tenants vacated it. At no time after he purchased the building did he use it as a single-family residence (until the City required him to do so), and his intent had never changed. After Conaghan testified, plaintiffs rested.

¶ 33    In argument, plaintiffs contended as follows. First, by ordinance, plaintiffs could lose their nonconforming use only by discontinuing it or evidencing an intent to abandon it. The City had not asserted that plaintiffs had done the latter, so the case hinged on whether they had "discontinued" the use. Plaintiffs maintained that discontinuation did not automatically follow from "simply not using [the property] as a two-unit for a period of 12 months." Had they used it as a single-family residence for 12 months, then tried to revert to renting it to two separate tenants, they could not revive the nonconforming use, but that had not happened.

¶ 34    Second, plaintiffs argued, they had done everything that they could to preserve the building's use as a multifamily residence, and the delays involved were not their fault. Even so, by 2011, the repairs were "90 percent complete." The purpose of the nonconforming-use ordinance was to protect the public health and safety, but that purpose was not served by the City's refusal to allow plaintiffs to continue the building's longstanding use simply because more than 12 months had elapsed. Thus, the City's denial of the petition to continue the nonconforming use had been arbitrary and capricious. Plaintiffs' argument did not mention *La Salle* or the reasoning of that opinion.

¶ 35    Defendants responded as follows. Plaintiffs had the burden to prove that the City's actions were arbitrary and capricious. They had not met their burden. Moreover, under the plain meaning of the nonconforming-use ordinance, the use of the building as a multifamily residence had been discontinued for at least 12 months after the tenants vacated it early in 2010. The dispute between the contractor and the insurance company was irrelevant.

¶ 36    Defendants argued further that, although the nonconforming use lapsed early in 2011, a year after the tenants left, the City waited more than a year from that date to issue a notice that plaintiffs had lost their nonconforming use. Yet, despite the notice provided by the July 17, 2012, letter from Santeler, which was also filed with the recorder of deeds' office, plaintiffs did nothing. In May 2013, the City sent plaintiffs another letter; this time plaintiffs finally appeared before the Zoning Commission, having waited 40 months without requesting an extension of the building permit. The nonconforming-use ordinance existed because sound policy disfavors nonconforming uses, and discontinuation promotes the public health and safety. Plaintiffs had allowed the use to expire. The City had not acted irrationally.

¶ 37    The trial judge announced his decision, stating as follows. The evidence of hardship was clear and convincing: Conaghan had been victimized by events beyond his control, specifically the accident that caused the flooding, followed by the delays occasioned by the dispute between the contractor and the insurance company. The City had provided no warning that the nonconforming use might be lost "because of elapsed time." Only "when [plaintiffs] came in to apply for their building permit they were (Unintelligible) that the two-flat use was gone because it had been abandoned. There were no exceptions. There was no warning, and there were no extensions."

¶ 38    The judge continued as follows. Plaintiffs had never intended to abandon the use of the property as a multifamily residence. From the time that the damage occurred, Conaghan had diligently attempted to renovate the property so as to restore it to that use. The judge concluded:

> "The diligent pursuit of the repair by Mr. Conaghan, who has stated from [*sic*] making the insurance claim, hiring a contractor, seeking an additional investor, all militate against the conclusion in the ordinance that there was a clear intention to abandon the property.
>
> The fact that it wasn't occupied as a rental unit by any resident is—is immaterial in this particular kind of a circumstance.
>
> The Court finds that the decision of the building inspector to declare this a discontinued use was arbitrary and capricious, and that the proof is indeed clear and convincing."

¶ 39    Defendants timely appealed.

## II. ANALYSIS

¶ 41    Defendants contend first that the trial court should not have entertained plaintiffs' action at all because section 11-13-25 of the Municipal Code does not confer a private right of action on a landowner against a municipality for its zoning decision. Plaintiffs respond that our decision in *Our Savior* correctly held that section 11-13-25 creates a private right of action.

¶ 42    To resolve this dispute, we must construe section 11-13-25. Our fundamental objective is to ascertain and effectuate the intent of the legislature. *King v. First Capital Financial Services*

*Corp.*, 215 Ill. 2d 1, 26 (2005). To do so, we start with the statutory language, which is ordinarily the best guide to legislative intent. *Id.* If the language is unambiguous, we must follow it without resorting to aids of construction and without reading in qualifications or additions that the legislature did not express. *Id.* To the extent that the language is ambiguous, we may resort to aids of construction, including legislative history. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 397-98 (2003). We may also follow the maxim that statutes that address similar subject matters are *in pari materia* and should be construed together to produce a harmonious whole. *People v. Rinehart*, 2012 IL 111719, ¶ 26.

¶ 43    For ease of discussion, we again set out section 11-23-25 of the Municipal Code:

"(a) Any decision by the corporate authorities of any municipality *** in regard to any petition or application for a special use, variance, rezoning, or other amendment to a zoning ordinance shall be subject to de novo judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrative for other purposes. Any action seeking the judicial review of such a decision shall be commenced not later than 90 days after the date of the decision.

(b) The principles of substantive and procedural due process apply to all stages of the decision-making and review of all zoning decisions." (Emphasis added.) 65 ILCS 5/11-13-25 (West 2012).

¶ 44    Before we apply principles of statutory construction to this language, we discuss the two appellate court opinions on which the parties place the greatest weight. In *Dunlap*, the plaintiff filed an action under section 11-13-15 of the Municipal Code (65 ILCS 5/11-13-15 (West 2006)), challenging the Village of Schaumburg's grant, by ordinance, of a zoning variance to her neighbors. Both the village and the neighbors were named as defendants. Section 11-13-15 provides that, if any building is constructed in violation of an ordinance adopted under division 13 of the Municipal Code, any owner or tenant of property within 1200 feet of the offending structure may file an action to correct, restrain, or abate the violation. *Dunlap*, 394 Ill. App. 3d at 632. The village moved to dismiss the action on the ground that section 11-13-15 does not give private landowners a right of action against a municipality. *Id.*

¶ 45    The trial court denied the motion. It held that, although section 11-13-15 did not grant the plaintiff a right of action against the village, section 11-13-25 did. The court eventually granted all the defendants summary judgment, and the plaintiff appealed. *Id.* at 636-37. On appeal, the first issue was whether either section 11-13-15 or section 11-13-25 gave the plaintiff a right of action against the village for its grant of the variance to a third party. The court recognized first that, although section 11-13-15 was not explicit on the matter, case law established that the section grants a right of action only against private violators and not against municipalities. *Id.* at 638-39. The court then turned to section 11-13-25.

¶ 46    At the pertinent time in *Dunlap*, subsection (a) of section 11-13-25 provided, " '*[a]ny special use, variance, rezoning, or other amendment to a zoning ordinance *** shall be subject to de novo review as a legislative decision, regardless of whether the process of its adoption is considered administrative for other purposes.*' " (Emphasis added.) *Id.* at 639 (quoting 65 ILCS 5/11-13-25(a) (West 2006)). The denial of a request for a special use, variance, or rezoning was not within the scope of section 11-13-25(a). With that caution in mind, we turn to the *Dunlap* court's construction of section 11-13-25(a).

¶ 47    The court began by explaining that enacting section 11-13-25(a) was a response to *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164 (2002). *Dunlap*, 394 Ill. App. 3d at 639.

- 9 -

*Klaeren* had held that a municipality's grant of a special-use permit is a quasi-judicial administrative decision, not a legislative one. *Klaeren*, 202 Ill. 2d at 183. Therefore, on judicial review for due process, the trial court must consider not only whether the act had a rational basis but also whether it met basic procedural requirements and followed "any criteria in the zoning ordinance based upon the facts in the record." *Dunlap*, 394 Ill. App. 3d at 641; see *Millineum Maintenance Management, Inc. v. County of Lake*, 384 Ill. App. 3d 638, 646-47 (2008).

¶ 48    The *Dunlap* court continued that, in enacting section 11-13-25(a), the legislature was concerned that municipalities "lacked the resources to conduct proceedings that would conform to the heightened level of scrutiny that is placed on administrative decisions." *Dunlap*, 394 Ill. App. 3d at 641-42. The court concluded:

> "Thus ***, the intent of the legislature in enacting this amendment to the Zoning Enabling Act was not to expand private landowners' right to take judicial action against municipal zoning decisions, but rather to clarify that when such challenges are properly made, the decisions are to be reviewed under the standards for legislative rather than administrative actions." *Id.* at 642.

The court held that the plaintiff had no action against the village under section 11-13-25(a). *Id.*

¶ 49    *Dunlap* cited *Millineum Maintenance*, in which this court construed section 5-12012.1 of the Counties Code (55 ILCS 5/5-12012.1 (West 2006)), which was substantively similar to section 11-13-25 of the Municipal Code but applied to counties only. The plaintiffs there brought an action for judicial review of the county board's denial of a conditional-use permit. *Millineum Maintenance*, 384 Ill. App. 3d at 639. On an interlocutory appeal by one defendant, we considered a certified question: whether the denial of the permit was " 'subject to de novo judicial review as a legislative decision under 55 ILCS 5/5-12012.1, per which "Any special use … *adopted* by the county board of any county … shall be subject to de novo judicial review as a legislative decision ***." ' " (Emphasis in original.) *Id.* (quoting 55 ILCS 5/5-12012.1(a) (West 2006)).

¶ 50    We began our analysis by noting *Klaeren*'s distinction between a municipality's or county's quasi-judicial administrative functions and its legislative functions. *Id.* at 641-42. Further, we observed, the Administrative Review Law does not apply to the legislative acts of legislative bodies. *Id.* at 642. We then held that, under the plain-meaning rule of statutory construction, only the grant of a special-use permit, and not the denial of one, was subject to the provision. *Id.* at 648.

¶ 51    The appellant raised another argument that focused on language in section 5-12012.1(a), which immediately followed the portion that we had just construed. It stated, " '[certain zoning decisions] shall be subject to de novo judicial review as a legislative decision, regardless of whether the process of its adoption is considered administrative for other purposes.' " *Id.* (quoting 55 ILCS 5/5-12012.1(a) (West 2006)). Of course, this provision is similar to section 11-13-25(a) of the Municipal Code. The appellant argued that section 5-12012.1 would violate the constitutional separation of powers were it read to require that special-use permit applications be reviewed as legislative, rather than administrative, decisions, as the legislature may not exercise such control over judicial decision making. *Id.* He contended that, if section 5-12012.1(a) required courts to consider the zoning decisions covered by the provision as legislative, even if their true character were judicial, the statute would usurp the judiciary's

authority. *Id.* We therefore considered the type and extent of "de novo judicial review" (55 ILCS 5/5-12012.1(a) (West 2006)) for which the provision called.

¶ 52    We construed this phraseology so as to avoid any constitutional infirmity. We observed that the legislature may not control the courts' power to adjudicate justiciable matters (*Millineum Maintenance*, 384 Ill. App. 3d at 649) and that a court may not directly review legislative decision making—but may decide whether legislation is unconstitutional (*id.* at 649-50). We held that the provision permissibly removed certain zoning decisions from the Administrative Review Law (*id.* at 650).

¶ 53    We next turned to whether, by providing for *de novo* review of zoning decisions as legislative acts, section 5-12012.1(a) impermissibly allowed the judiciary to infringe on the prerogatives of legislative bodies. We adopted a narrow construction that avoided this danger. We noted that a statute that grants a party a trial *de novo* on an action to review an administrative agency's decision without giving any deference to the agency's decision would be unconstitutional. *Id.* However, consistent with the separation of powers, the trial court could still receive new evidence, and it could review the (now) "legislative" zoning decision for violations of substantive due process. *Id.* at 651-52. We explained:

> "[A]t the time the legislature enacted section 5-12012.1, courts had chosen between two types of review for the relevant categories of zoning decisions—administrative review under the Administrative Review Law or 'legislative' review for arbitrariness as a matter of substantive due process [citation]—before finally settling on the former option [citation]. Against this backdrop, the language of section 5-12012.1, which invokes 'de novo judicial review *as a legislative decision*' (emphasis added), indicates an intent to remove certain zoning decisions from the bounds of administrative review and instead choose the second, 'legislative' type of review. As the legislature has the authority to dictate the type of review applicable to administrative decisions, this interpretation renders section 5-12012.1 constitutional.
>
> The same language, 'de novo review *as a legislative decision*' (emphasis added), also provides a necessary qualification on the 'de novo' hearing the statute describes. *** [W]holly '*de novo*' judicial review of an administrative decision impermissibly invites the judiciary to perform executive functions ***. The 'as a legislative decision' language invokes the alternative type of review described in [*City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1, 14 (2001)]: review for 'arbitrariness as a matter of substantive due process.' [Citation.] This so-called 'legislative' test prescribes the deference to agency decision making necessary ***, because it requires not that a court independently reevaluate facts or assert independent judgment, but rather that a court intervene only where there was no rational basis for the challenged decision, just as it would with a legislative enactment. Though *** evidence outside the already-developed record may be presented to the trial court, that evidence must bear on a much narrower question than is presented in typical administrative review. Since a trial court in this type of case must confine itself to the question of whether the challenged decision had any rational basis (just as it would with a legislative enactment), the trial court may not conduct even the limited direct factual review allowed under the Administrative Review Law (just as it could not with a legislative enactment). Thus ***, the evidence received must bear on the court's

- 11 -

review 'for arbitrariness as a matter of substantive due process under the six-part test set forth in [*La Salle*].' " *Id.* at 652-53.

We note that this statement of the limited role for the judiciary in reviewing zoning decisions is consistent with what our supreme court later stated: "Zoning is primarily a legislative function, and it is within the province of local governmental bodies to determine the use of land and to establish zoning classifications." *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 11. Thus, constitutional constraints on the zoning power are always appropriate for judicial consideration, but judicial review in other respects may be limited by the legislature. Even with the addition of *de novo* review, the intent of section 5-12012.1 was to narrow the range of judicial inquiries into municipal zoning decisions.

¶ 54 We now turn to *Our Savior*, which we discuss in the context of the foregoing opinions. In *Our Savior*, as pertinent here, the plaintiff applied for a special-use permit for proposed changes to its property. The defendant's city council initially denied the applications but later granted a special-use permit subject to several conditions. In between the two decisions, the plaintiff filed a three-count complaint in the trial court, based on (1) the Administrative Review Law, (2) *certiorari*, and (3) a request for a declaratory judgment (see 735 ILCS 5/2-701 (West 2006)) that the city's actions violated a state statute. Apparently, the plaintiff's complaint did not assert section 11-13-25 of the Municipal Code as an independent basis for a cause of action. The trial court ruled for the city on all three counts, reasoning that the city's decision was not against the manifest weight of the evidence. *Our Savior*, 397 Ill. App. 3d at 1017-18. The plaintiff appealed.

¶ 55 In addressing the plaintiff's argument that the city had improperly denied the permit applications, we first clarified that we were concerned with the city's denial of the plaintiff's original application, and we then turned to "the standard of review to be applied" to that action. *Id.* at 1025. After *Millineum Maintenance* was issued, the legislature had amended both section 5-12012.1 of the Counties Code and section 11-13-25 of the Municipal Code so that they now applied to either the grant or the denial of a special-use permit. *Id.* at 1025-26. We noted that the trial court had treated the decision as an administrative (quasi-judicial) one to be reviewed in accordance with *Klaeren*, which had been the law when the trial court ruled. *Id.* at 1025. However, in the interim, the legislature had passed the amendment to section 11-13-25(a), which now called for " 'de novo judicial review' " of the denial of a special-use permit. *Id.* at 1026 (quoting Pub. Act 95-843, § 5 (eff. Jan. 1, 2009)). After deciding that the amended section 11-13-25(a) applied retroactively (*id.*), we considered what it meant for the case before us. We stated:

> "This 'de novo judicial review as a legislative decision' is not the familiar *de novo* standard of appellate review generally applicable in appeals of purely legal issues, grants of summary judgment, and so on. *Millineum Maintenance*, 384 Ill. App. 3d at 653. Indeed, it is not a standard of appellate review at all. Rather, it describes a wholly new action under which a plaintiff may challenge a zoning decision in the same manner that a plaintiff may challenge a legislative action. Thus, 'the "*de novo*" language indicates that, unlike typical administrative review, evidence outside the already-developed [administrative] record may be presented to the trial court.' *Millineum Maintenance*, 384 Ill. App. 3d at 653." *Id.* at 1027.

¶ 56 Applying the foregoing to the facts of *Our Savior*, we noted that, although the city's decision must be reviewed as a legislative one per the amended section 11-13-25(a), the trial

court had tried the case on the assumption that *Klaeren* applied (as indeed it had at the time) and therefore had proceeded under the Administrative Review Law. Thus, the court and both parties had assumed that the administrative record could not be supplemented with new evidence and that the only issue was whether that preexisting record demonstrated that the city's decision had been against the manifest weight of the evidence. *Id.* at 1027-28. We remanded the cause so that the parties could present new evidence on, and the trial court could decide, whether the denial of the permit "passe[d] muster as a legislative decision, that is, whether it complie[d] with substantive due process (or any other barriers to legislative action)." *Id.* at 1028-29. In so doing, the court was to apply the *La Salle* factors, as the plaintiff's argument was that the city's decision had been arbitrary and capricious as applied to the facts of the case. *Id.* at 1029.

¶ 57     Finally, we note that, in two opinions postdating *Our Savior*, the First District followed *Dunlap* and held that section 11-13-25 does not create a private right of action but merely provides standards of review in cases that are already properly in court. *Figiel v. Chicago Plan Comm'n*, 408 Ill. App. 3d 223, 233 (2011); *Condominium Ass'n of Commonwealth Plaza v. City of Chicago*, 399 Ill. App. 3d 32, 47-48 (2010).

¶ 58     We consider the implications of the foregoing opinions for the construction of section 11-13-25 of the Municipal Code. In every opinion other than *Our Savior*, the appellate court unambiguously held that section 11-13-25 does not create a private right of action against a municipality. It is true that, in these opinions, the plaintiffs sought to challenge municipal zoning decisions in which zoning changes were granted or denied to third parties and not to the plaintiffs themselves. But that this is a meaningful distinction is by no means self-evident.

¶ 59     Only *Our Savior* provides any support for plaintiffs' argument that such a private right of action exists. In *Our Savior*, however, the plaintiff did not actually assert a cause of action under section 11-13-25. Instead, it relied on (1) the Administrative Review Law, (2) *certiorari*, and (3) the statute commonly known as the declaratory judgment act (735 ILCS 5/2-701 *et seq.* (West 2006)). Here, plaintiffs' complaint did not invoke any of these three grounds. (Plaintiffs even state that the first ground is unavailable.) Thus, although there is reasonably clear case authority against plaintiffs, the sole authority that they invoke is arguably *dictum*, even if it is as plain as plaintiffs contend it is.

¶ 60     *Our Savior* relied heavily on *Millineum Maintenance*, which, as noted, did not hold that section 11-13-25's cognate provision, section 5-12012.1 of the Counties Code, creates a private right of action against a unit of government's zoning decision. Instead, *Millineum Maintenance* held that section 5-12012.1 means that judicial review of specified county zoning decisions shall treat these decisions as legislative acts and not administrative acts. Based on our reading of *Millineum Maintenance*, we cannot say whether the plaintiff in that case relied on section 5-12012.1 as a basis for relief; the opinion does not say either way. Had this court intended to announce a holding that section 5-12012.1 creates a private right of action, it would seem that our opinion would have said so directly. Instead, this court (apparently) presupposed that, on whatever basis, the plaintiff's action had properly been before the trial court.

¶ 61     In view of this background, we cannot read one paragraph in *Our Savior* to hold that, in enacting sections 5-12012.1 of the Counties Code and 11-13-25 of the Municipal Code, the legislature intended to create brand-new causes of action for private property owners against governmental bodies' zoning decisions. More fundamentally, that holding is not compelled by

the statutory language itself, and insofar as the history of the legislation sheds light on the issue, it helps to persuade us that section 11-13-25 should receive a more modest construction.

¶ 62    As we noted earlier, the plaintiff in *Our Savior* did not assert that section 11-13-25 gave it a private right of action against the defendant municipality. The plaintiff relied on other grounds, none of which plaintiffs have invoked here. Thus, without a clear holding that section 11-13-25 creates a private right of action, plaintiffs rely on our statement that " 'de novo judicial review as a legislative decision' " (see 65 ILCS 5/11-13-25(a) (West 2006)) was not "a standard of appellate review at all" but "describes a wholly new action under which a plaintiff may challenge a zoning decision in the same manner that a plaintiff may challenge a legislative action." *Our Savior*, 397 Ill. App. 3d at 1027. Theoretically, at least when read in isolation, this passage *could* be taken to mean that section 11-13-25 creates a wholly new cause of action. But it could as easily be given a more modest construction: that section 11-13-25 provides not for review *de novo* but for a hearing *de novo*—in a case that is properly before the court on some other established basis. And, as *Millineum Maintenance* explained, this hearing *de novo* would be limited to the issue of whether the zoning authority's legislative decision violated due process.

¶ 63    Thus, as we explained in *Millineum Maintenance*, the hearing *de novo* in the trial court that section 11-13-25 provides enables the parties to introduce new evidence that had not been before the county or municipality that decided the zoning matter. But enabling parties to introduce new evidence and new issues once they are in court is very different from enabling them to enter the courthouse in the first place. Nothing in *Our Savior* compels us to hold that section 11-13-25 creates a wholly new private right of action, even were we committed to adhering to our opinion on a matter that was not directly before us.

¶ 64    Moreover, and more fundamentally, section 11-13-25 itself does not support the broad reading that plaintiffs give *Our Savior*. Even could we read that opinion as broadly as do plaintiffs, we would not follow it.

¶ 65    Section 11-13-25(a) reads, in part, "Any [zoning] decision by the corporate authorities of any municipality *** shall be subject to de novo judicial review as a legislative decision ***." 65 ILCS 5/11-13-25(a) (West 2014). Again, reading this language in isolation, it is *possible* to see it as creating a brand-new cause of action for private property owners against municipalities. However, aside from the fact that the legislature might have used more straightforward language to effect such a change, this language can reasonably be read to imply that the legislature intended only to provide a hearing *de novo*, under the legal standards for legislative acts, in a case that is *already* properly before the trial court. Phrased differently, the language can be read to state merely that the rules for judicial review of zoning decisions have been changed and not that the availability of judicial review has been expanded. The amendment that the legislature chose focused on new procedural rules and legal standards.

¶ 66    But the deciding consideration is that, read in the broader constitutional and statutory context, section 11-13-25 is not even ambiguous, and we cannot construe it to create a new private right of action.

¶ 67    Our state's trial courts have original jurisdiction of all justiciable matters but only "such power to review administrative action as provided by law." Ill. Const. 1970, art. VI, § 9. Thus, a party seeking judicial review of a municipal zoning decision must establish that the trial court has jurisdiction as provided by law. And proof of this prerequisite does not follow from the mere fact that section 11-13-25 provides that a zoning decision "shall be subject to de novo

- 14 -

judicial review as a legislative decision, *regardless of whether the process in relation thereto is considered administrative for other purposes.*" (Emphasis added.) 65 ILCS 5/11-13-25(a) (West 2014).

¶ 68        Reading section 11-13-25 in the context of division 13 of article 11 of the Municipal Code refutes the assertion that it creates a new cause of action. Division 13 sets out municipal zoning powers. Section 11-13-11 (65 ILCS 5/11-13-11 (West 2014)) sets out procedural requirements for every grant of a variance or special use, whether made by a municipality's board of appeals or by ordinance. Section 11-13-12 (65 ILCS 5/11-13-12 (West 2014)) sets out rules for appeals to the municipality's board of appeals. Section 11-13-13 (65 ILCS 5/11-13-13 (West 2014)) makes all final administrative decisions of the board of appeals subject to judicial review under the Administrative Review Law.

¶ 69        Of most direct significance here is section 11-13-15, which stands in contrast to section 11-13-25 in respects that are crucial here. Section 11-13-15 does create a separate cause of action, albeit not against the municipality (*Dunlap*, 394 Ill. App. 3d at 638-39). That this was the intent of the legislature cannot be doubted, because section 11-13-15 is both explicit in its purpose and detailed in the procedures it creates toward that purpose.

¶ 70        Section 11-13-15 initially provides that, if any building or structure violates a zoning ordinance, either the municipal authorities or any landowner or tenant within a given distance who is affected by the violation, "*in addition to other remedies*, may initiate any appropriate action or proceeding" to prevent or abate the violation. (Emphasis added.) 65 ILCS 5/11-13-15 (West 2014). This language in itself plainly creates a new ground for a cause of action. Section 11-13-15 then provides rules for notice to the municipality whenever any such action is instituted by a private party and gives the trial court "[i]n any action or proceeding for a purpose mentioned in this section" the discretion to issue injunctive relief. *Id.* Next, section 11-13-15 requires the trial court to award reasonable attorney fees to a successful private plaintiff. Finally, section 11-13-15 states that a private plaintiff need not prove special damages to his property "in order to maintain a suit under the foregoing provisions." *Id.* Thus, section 11-13-15 sets out a detailed scheme for a specific type of proceeding, with specific provisions for notice, injunctive relief, attorney fees, and proof of damages. When the legislature intended to create a new cause of action, it knew how to do so without leaving any doubt as to its purpose.

¶ 71        Section 11-13-25 is altogether different. It shows no such indicia of an intent to open a new avenue of relief or create a new type of action. The title, "Actions subject to de novo review; due process" (65 ILCS 5/11-13-25 (West 2014)), itself implies that the purpose of the section is to specify rules for (some) preexisting types of proceedings. More important, in contrast to section 11-13-15, section 11-13-25 does not state that a specified class of plaintiffs may institute an action or proceeding; does not provide for notice to the municipality; does not grant any specific powers, injunctive or otherwise, to a trial court; says nothing about special damages or the type of injury that a plaintiff need show; and does not provide for awarding attorney fees. All these provisions are conspicuously absent from section 11-13-25, for the logical reason that section 11-13-25 was never intended to create a new cause of action, and the matters that such provisions would address are already covered by the statutes that actually do create independent rights of action. Section 11-13-25 is limited to standards of review in preexisting causes of action and to reciting the principle—which would apply even absent such an explicit recitation—that constitutional due process applies to zoning decisions.

¶ 72    Insofar as we need consider the legislative history of section 11-13-25, it refutes plaintiffs' interpretation. As Senator Garrett, quoted in *Millineum Maintenance*, explained, the primary aim of section 11-13-25(a) was to nullify *Klaeren*'s holding that municipal zoning decisions are administrative and not legislative—and the primary motivation for this legislative undoing of *Klaeren* was the concern that subjecting zoning decisions to review as administrative acts, not legislative ones, would place an undue burden on municipalities (and counties):

> " 'The corporate authorities of municipalities and counties are primarily—lawmaking bodies that operate through the political process. Their legislative decisions have traditionally been subject to de novo judicial review. While accepting the Supreme Court's analysis regarding the character of the special use permit process, the General Assembly notes that quasi-judicial proceedings are to be reviewed on the record, which in turn requires such proceedings to be conducted in the manner of a mini-trial. Given their essential legislative character, the corporate authorities of municipalities and counties are not well suited to—conduct mini-trials. In order to promote the efficient and effective governance of municipalities and counties, the General Assembly hereby adopts Senate Bill 94. Senate Bill 94 is not intended to question the essential conclusions in Klaeren regarding the legal character of special use permit decisions or due process, but it provides that any special use decision made by a municipality—or county shall be treated as legislative decisions subject to de novo judicial review.' "
> *Millineum Maintenance*, 384 Ill. App. 3d at 646 (quoting 94th Ill. Gen. Assem., Senate Proceedings, May 3, 2006, at 22-23 (statements of Senator Garrett)).

See also *Dunlap*, 394 Ill. App. 3d at 641-42 (citing *Millineum Maintenance*, 384 Ill. App. 3d at 646-47, court explained that the passage of section 11-13-25 was "born out of the legislature's concern that corporate authorities of municipalities lacked the resources to conduct proceedings that would conform to the heightened level of scrutiny that is placed upon administrative decisions").

¶ 73    We decline to read an enactment that was aimed primarily at easing the burden on counties and municipalities as creating a right of action that could potentially increase the burden on these same bodies. We agree with defendants that section 11-13-25 does not create a right of action for property owners to challenge zoning decisions. As the viability of plaintiffs' complaint depended on a contrary premise, we must reverse the trial court's judgment outright.

¶ 74    We intimate no position on whether plaintiffs could have based their action on something other than section 11-13-25, such as the declaratory judgment act. Plaintiffs never attempted to use any key to the courthouse door other than section 11-13-25.

¶ 75    Owing to our holding, we need not decide whether the trial court erred in holding that the denial of plaintiffs' petition deprived them of due process.

¶ 76    For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed.

¶ 77    Reversed.